FILED

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

2015 DEC 18  P 4: 01

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA,

    **Plaintiff,**

        v.

APPROXIMATELY $2,028,163.59 IN FUNDS
SEIZED FROM BANK ACCOUNT NO.
167108214 at BURKE & HERBERT BANK, IN
THE NAME OF WTC2, INC., ALSO KNOWN
AS OPERATING ACCOUNT WTC2, INC.  ("BH
Account x8214"),

    **Defendant _in Rem._**

Civil Action No. 1:15-CV- 1670
(AJT/IDD)

## VERIFIED COMPLAINT FOR FORFEITURE _IN REM_

Comes now the Plaintiff, United States of America, through its undersigned attorneys, and alleges as follows:

### NATURE OF THE ACTION

1.    The United States brings this action _in rem_ seeking the forfeiture of all right, title, and interest in approximately $2,028,163.59 in United States currency seized from bank account # 167108214 at Burke & Herbert Bank, in the name of WTC2, Inc., also known as operating account WTC2, Inc.  ("BH Account x8214").

2.    The United States' claim arises from a scheme to illegally employ aliens and to launder and structure the proceeds of that scheme.

3.    As set forth below, the defendant property constitutes the proceeds of violations of 8 U.S.C. § 1324(a) (Unlawful Employment of Aliens), as well as property involved in the

1

laundering of such proceeds, in violation of 18 U.S.C. §§ 1956 and 1957 (Money Laundering), and property involved in structuring, in violation of 31 U.S.C. § 5324 (Structuring); and are therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C) and 31 U.S.C. § 5317.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over actions commenced by the United States under 28 U.S.C. § 1345, and over forfeiture actions under 28 U.S.C. § 1355(a) and (b).

5.     This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia. This Court also has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b)(1)(B) because it is located in the Eastern District of Virginia.

6.     The defendant property is located in the Eastern District of Virginia in the custody of the United States Customs and Border Protection.

7.     Venue is proper within this judicial district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Eastern District of Virginia and 28 U.S.C. § 1395(a) because the cause of action accrued in this district and the defendant property is located in this district.

## FACTUAL ALLEGATIONS

### I.     Immigration & Employment Regulatory Background

8.     Generally, a visa is required for any non-U.S. citizen (alien) who resides in a foreign country to enter the United States. An alien who resides in a foreign country may apply for and be granted a visa if such alien is otherwise qualified under the Immigration and Nationality Act (INA). The INA makes a basic distinction between immigrant aliens and

nonimmigrant aliens with regard to length of stay and permissible activities, with the employability of nonimmigrant aliens by United States businesses as the most significant regulatory and statutory subset.

9.     To work in the United States, an employee must be issued a Social Security number (SSN), which is used by the employer to report an individual's wages to the government and to determine a person's eligibility for Social Security benefits. Generally, only nonimmigrants who hold specific visa classifications that authorize them to work in the U.S can obtain a SSN. A nonimmigrant applying to the Social Security Administration for a SSN must prove his or her identity and work-authorized immigration status by showing current, valid U.S. immigration documents and an unexpired foreign passport.

10.     Nonimmigrant visa classifications, such as B-1/B-2 (visitor/tourist), do not authorize the holder to work for a U.S. employer, nor do they, under most circumstances, permit an alien to apply for or receive a SSN.

11.     Nonimmigrant visa classification F-1 (Academic Student) allows an alien to enter the United States as a full-time student at an accredited college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in a language training program. F-1 students may not work off-campus during the first academic year, but may accept on-campus employment subject to certain conditions and restrictions. There are various programs available for F-1 students to seek off-campus employment after the first academic year, but it must be related to the student's area of study and must be authorized prior to starting any work by the Designated School Official.

12.     Section 1324(a) of Title 8, United States Code, requires U.S. employers to hire only individuals who may legally work here: U.S. citizens, noncitizen nationals, lawful

permanent and/or conditional residents and aliens authorized to work. To comply with 8 U.S.C. § 1324(a), employers must verify the identity and employment authorization of each person they hire and also complete and retain a Form I-9 (Employment Eligibility Verification) for each employee.

13.     The H-1B Visa Program allows businesses in the United States to temporarily employ foreign workers with specialized or technical expertise in a particular field such as accounting, engineering, or computer science. Before hiring a foreign worker under the H-1B Visa program, the employer must first obtain approval from the U.S. Department of Labor (DOL).

14.     Under Section 313 of the Immigration Reform and Control Act of 1986 (Public Law 99-603), an exception to the visa requirement was established. This exception is referred to as the Visa Waiver Program (VWP). The VWP provides for visa-free travel by nationals of designated countries coming to the United States for tourism or business (B visa purposes) for a period not to exceed 90 days, provided the national is from a designated country. Admission to the United States under the VWP expressly does not authorize the holder to work for a United States employer, nor does it permit an alien to apply for or receive a SSN.

15.     A company that wants to hire employees and conduct business in the United States must register with the Internal Revenue Service (IRS) to obtain an Employer Identification Number (EIN). The EIN is used to identify the business entity for federal corporate income tax reporting purposes with the IRS. Additionally, businesses with one or more employees are required to withhold federal and state income and Social Security and Medicare taxes under the Federal Insurance Contributions Act (FICA) from wages paid to employees. Businesses that have paid employees at least $600 in a given year are required to issue forms W-2 (Wage and

4

Tax Statement). Businesses are also subject to paying unemployment tax under the Federal Unemployment Tax Act (FUTA). In addition to similar IRS corporate and payroll reporting requirements, Virginia employers must register their EIN and the SSN of all wage-earning employees with the state departments of taxation for corporate, sales and payroll tax reporting and payment purposes. They must also register their EIN and the SSN of all employees with the Virginia Employment Commission (VEC) for quarterly wage reporting and FUTA tax remittance purposes.

## II.    Relevant Persons and Entities

16.     World Trade Company (WTC2) and US Plastics LLC (US Plastics) are owned and operated by ALAA GARADA (ALAA) and RAFIK MOHEYELDIN (RAFIK).

17.     WTC2 is incorporated in Virginia and has its principal place of business at 14980 and 14990 Farm Creek Drive in Woodbridge, Virginia. WTC2 purchases and resells used goods, such as shoes and clothing. Many of the entities and individuals that purchase items from WTC2 are overseas. WTC2 is accordingly involved in packaging and preparing the used goods for export to customers overseas. WTC2 is the only known source of income for ALAA and RAFIK. US Plastics is a company that is owned and controlled by ALAA and RAFIK in 2013. US Plastics collects bulk plastic material, sorts it, and processes some plastic through recycling machinery. US Plastics uses the same warehouse in Woodbridge, Virginia as WTC2 for at least some of its operations.

18.     **BH Account x8214** is the Operating Account for WTC2.

## III.    Factual Background

19.     **BH Account x8214** has been used to facilitate a scheme and conspiracy to unlawfully employ aliens not authorized to work in the United States. As part of that scheme,

ALAA and others have caused those individuals not to be reported to the IRS or Virginia

Employment Commission.  Proceeds from WTC2's sale of used goods are deposited into **BH**

**Account x8214**.  At least some of these illegally employed workers are involved in the sale

and/or preparation for sale (and shipment to the seller) of these used items.  When it was

originally opened, **BH Account x8214** was funded with approximately $1 million in proceeds

from WTC2's prior operating account, which was at PNC bank account x3614.  Funds in PNC

account x3614 derived from the same activities (namely, sale of used goods by WTC2) as **BH**

**Account x8214**.

20.     ALAA, on behalf of WTC2, submitted applications to the DOL and to the

Department of Homeland Security (DHS) for petitions for H-1B specialty occupation work visas

for family members to be employed at WTC2.  Some of these petitions included false and

fraudulent supporting documentation, including one filed by WTC2 by ALAA for his sister-in-

law, Lina EL Nakka (LINA), as explained in paragraphs 28-30.

21.     On other H-1B applications, ALAA reported anywhere from approximately 30 to

54 employees working at WTC2, however a check of VEC wage records shows that from 2010

through at least the third quarter of 2014, WTC2 has only had a single employee, ALAA's wife,

Rim EL NAKA (RIM), an H-1B Visa beneficiary sponsored by WTC2.  WTC2 in fact employs

several dozen workers, including KHALED Garadah, ALAA's nephew, who is present in the

United States on an F-1 Student Visa and who is not authorized to work in the United States.

22.     Many of the employees of WTC2 are aliens who cannot lawfully work in the

United States.  Most of WTC2's employees have not been subject to payroll tax withholding by

WTC2, as required by law.  As a result, the profits earned by WTC2 are greater than they would

have been if WTC2 hired persons who were lawfully able to work in the United States because WTC2 does not withhold or pay over payroll taxes to the IRS.

23. Many of the aliens who are illegally employed are paid in cash, which is withdrawn from **BH Account x8214** by ALAA and/or RAFIK in weekly increments of exactly $9,000. ALAA and/or RAFIK used cash to pay their workers in part to conceal and disguise the nature and use of those funds, since cash is not easily traceable. Further, by keeping the cash withdrawals less than $10,000, ALAA and RAFIK are further able to conceal their activities by avoiding transaction reporting requirements. The investigation has revealed that ALAA provides the money to pay WTC2 employees, but that AKRAM is the one who typically pays the employees.

24. VEC wage records and IRS Form W-2s filed by WTC2 for the period 2011 to present show that the only employed person for whom those reports and statements were filed by WTC2 was ALAA'S wife RIM.

25. On an I-140 Petition filed on behalf of ALAA'S brother Akram GARADA (AKRAM), ALAA attested under penalty of perjury that the petition and the evidence submitted with it was true and correct. The petition was filed on behalf of WTC2 and dated July 30, 2007. In that petition, ALAA listed 62 employees for WTC2. In support of the petition, a letter from ALAA was submitted, which purported to offer AKRAM a permanent position as an Export Manager at WTC2. The petition also included a copy of a 2006 Form W-2 for AKRAM, issued by WTC2. The W-2 showed wages of $42,000. ALAA also included WTC2's 2006 U.S. Income Tax Return for an S Corporation (Form 1120S), which showed a deduction of $96,000 for salary and wages. AKRAM'S petition was subsequently approved.

26.     On an I-129 Petition filed on behalf of RIM that was dated March 5, 2008, ALAA

attested under penalty of perjury that the petition and the evidence submitted with it was true and

correct. This petition was submitted on behalf of WTC2. As a petition to extend a prior petition,

ALAA certified that the proposed employment was under the same terms and conditions as

stated in the prior approved petition. In that petition, ALAA listed 15 employees for WTC2. In

a letter dated March 5, 2008, ALAA stated that WTC2 "currently employs 15 individuals." A

copy of a 2007 Form W-2 for RIM showed wages of $47,494 paid by WTC2. WTC2's 2007

Form 1120S was also included with the petition; it showed a deduction for salary and wages of

$82,800. In support of RIM'S later adjustment of status application, ALAA provided a letter on

behalf of WTC2 dated December 19, 2011, which stated that RIM was an account manager and

had been working for the past six years, starting in July 2005. Attached to the letter was a list of

WTC2 checks issued to RIM, beginning with check number 4097 (dated August 29, 2005) and

ending with check number 8180 (dated December 1, 2011). The total amount of these checks

was $435,200. RIM worked for WTC2 as an account manager and WTC2 had 48 employees.

RIM'S visa petition was subsequently approved.

27.     On an I-129 Petition filed on behalf of ALAA'S nephew Ahmed GARADA

(AHMED), ALAA attested under penalty of perjury the evidence submitted with it was true and

correct. This petition was filed on behalf of WTC2 and dated April 2, 2008. In this petition,

ALAA listed WTC2 as having 15 employees. In a resume for AHMED submitted in support of

the petition, Ahmed's Professional Experience is listed as "Administrative Support" with WTC2

from January 2008 to present, with duties such as "Prepare orders for international and domestic

shipping, Help in computation of payroll." A copy of WTC2's 2007 Form 1120S was also

included as supporting documentation; it showed a deduction for salaries and wages of $82,800.

AHMED'S visa petition was subsequently approved.

28.     On an I-129 Petition filed on behalf of ALAA'S sister-in-law  LINA, ALAA

attested under penalty of perjury that the evidence submitted with it was all true and correct. This

petition was filed on behalf of WTC2 and signed in March 2014.  On both the I-129 Petition and

in a March 2014 letter submitted in support of that petition, ALAA stated that WTC2 was

established in 1997 and currently employs 54 individuals.  ALAA also stated that WTC2 was

expanding its operations and employing more workers.  In a related August 2014 letter submitted

in support of LINA's petition, ALAA stated that WTC2 had an average of 30 employees at the

time and a gross income of $8,000,000 in 2013.  In a subsequent April 30, 2015, letter submitted

in support of LINA's application, ALAA stated that in 2013, WTC2 decided to expand its

operations by establishing an affiliate company, U.S. Plastics.  ALAA wrote that: "Both

companies share the same owner by the same individual and their entire operations coordinated

and merged."

29.     In support of LINA'S 2014 I-129 Petition, a graduation certificate was submitted

that purported to have been issued to LINA by Ain Shams University in Cairo, Egypt, awarding

her a Bachelor's Degree in Business and Accounting on September 30, 2011.  According to Ain

Shams University employees, the educational credential submitted by ALAA to establish

LINA's qualifications to work as an accountant was fraudulent; Ain Shams University has no

record of anyone with LINA's name attending the university. A document recovered from the

email account alangarada@hotmail.com pursuant to an email search warrant showed that a

person believed to be ALAA produced a letter to U.S. Citizenship and Immigration Service

(USCIS) on behalf of LINA, related to her change of visa status from B-2 (Tourist/Visitor) to F-

1 (Academic Student), in or about April 2013. The text of the letter read in part "I have four year business degree from Ain Shams University as well as five year dental degree from Misr International University. In addition, I have a job offer to work in Egypt as a Dentist for a private company. Because of this, I am trying to learn English to expand my clientele for the future. After I complete my English courses, I will return back to Egypt where I permanently reside." The investigation has revealed that LINA worked as an unpaid intern at a dental practice in McLean, Virginia while residing with ALAA and RIM. LINA'S H-1B petition to work as an accountant for WTC2 has not yet been approved. At no time since her latest entry in 2012 to the United States has LINA been authorized to work in the United States.

30.      Among the documents submitted to USCIS to support LINA's application were copies of 12 job applications for individuals who applied for jobs with WTC2 or U.S. Plastics in 2014. On seven of the applications, the applicants indicated that they did not have identification documents, such as driver's licenses. The applications included the question, "Are you legally authorized to be employed in the USA?" and had "yes" or "no" boxes for the applicant to mark in response. Nine of the applicants marked "yes" and three left the question unanswered. Government database checks revealed that five of the individuals were authorized by DHS to work in the United States, but there was no record that the other seven individuals were, or had ever been, authorized by DHS to work in the United States.

31.      On several dates between June 2015 and August 2015, approximately 30 and 50 individuals were observed reporting to work at WTC2 at14980 and 14990 Farm Creek Drive, Woodbridge, Virginia. Job applicant information provided by WTC2 to USCIS along with surveillance and bank records shows at least 50 individuals appeared to have worked at WTC2 during 2014 and/or 2015, at least 10 of whom were not authorized by DHS to work in the United

States, as detailed below in paragraphs 32- 41. Additionally, on September 3, 2015, a search

warrant was executed at the offices of WTC2 and US Plastics in Woodbridge, Virginia. During

the search, the agents saw and spoke to numerous employees. At least 25 of the employees who

were seen working at WTC2 and US Plastics on that day were identified as aliens who were

illegally employed by WTC2 and US Plastics. The investigation has determined that ALAA and

RAFIK were involved in the hiring, management, and oversight of these employees. The aliens

who were working for WTC2 and US Plastics without proper authorization included the

following:

32.    Modar Khezeddin KDAIMATI is an Italian citizen present in the United States

under the VWP discussed in paragraph 14. Because KDAIMATI was admitted under the VWP,

KDAIMATI has never been and was not authorized to work in the United States. Between June

and August 2015, KDAIMATI and/or vehicles he used were observed at WTC2 on at least six

occasions. Since the beginning of 2014, KDAIMATI has received checks from WTC2 or

ALAA, all of which were signed by ALAA and some with the notation "PR." KDAIMATI was

seen at WTC2 and US Plastic's office during the execution of the search warrant on September

3, 2015. The investigation has determined that KDAIMATI was hired by ALAA and has been

employed since at least October 2014.

33.    Jose Nelson LEON MARTINEZ is a citizen of El Salvador. In 2000, he was

refused a B-1/B-2 Visitor's Visa at the U.S. Embassy in San Salvador. DHS records reflect that

LEON MARTINEZ has not been lawfully admitted to the United States and is not authorized to

work in the United States. During periodic surveillance, a vehicle registered to LEON

MARTINEZ was observed by agents at WTC2 on multiple occasions. LEON MARTINEZ's

name and biographic information appeared on one of the twelve USA Plastics job applications

submitted by WTC2 to USCIS as evidence of WTC2/USA Plastics expansion. LEON

MARTINEZ was also a payee on checks issued by ALAA or WTC2 in 2014 and 2015. LEON

MARTINEZ was seen at WTC2 and US Plastic's office during the execution of the search

warrant on September 3, 2015. The investigation has revealed that LEON MARTINEZ has been

employed at US Plastics for approximately one year and is sometimes paid in cash by AKRAM.

34.     Norma Consuela RUIZ DE AGUILAR has no record in DHS databases.

Department of State (DOS) records show Norma Consuelo RUIZ DE AGUILAR (born in El

Salvador) was refused a B1/B2 Visa on October 18, 2001; RUIZ DE AGUILAR was also one of

the U.S. Plastics job applicants and a vehicle registered in her name was seen at WTC2 on July

16 and 30 and August 7, 2015. RUIZ DE AGUILAR was seen at WTC2 and US Plastic's office

during the execution of the search warrant on September 3, 2015. The investigation has revealed

that she was hired in approximately October 2014 and that her manager, Nahima JARQUIN

(JARQUIN), never verified RUIZ DE AGUILAR's false claim on her application that she was

authorized to work in the United States, nor did JARQUIN aske to see any employment

authorization documents. RUIZ DE AGUILAR s was paid in cash and also by personal check

drawn on an account held in JARQUIN'S name.  WTC2 and US Plastics' practice of having

some illegally employed aliens paid by JARQUIN had the effect of concealing the payments to

illegal aliens, since these payments would not appear on the bank records of WTC2 or US

Plastics.

35.     Santos Erasmo PINEDA VALLECILLO.  DHS records show an in absentia

removal order by an Immigration Judge was signed on March 27, 2007, and a Warrant of

Deportation issued on March 5, 2010. A vehicle registered in his name was observed at WTC2

in June, July and August 2015. PINEDA VALLECILLO was seen at WTC2 and US Plastic's

office during the execution of the search warrant on September 3, 2015. The investigation has revealed that PINEDA VALLECILLIO was hired by ALAA and AKRAM in 2006 to work at WTC2. PINEDA VALLECILLO was paid in cash by both ALAA and AKRAM.

36.    Nelly CARRANZA PORTILLO was seen at WTC2 and US Plastic's office during the execution of the search warrant on September 3, 2015. The investigation has revealed that she was the girlfriend of PINEDA VALLECILLO and that she had been employed at WTC2 since approximately November 2008. CARRANZA PORTILLO was not asked for any personal information other than her name when she was hired and has been paid in cash by both ALAA andAKRAM..Leonor ORTIZ DE CORPENO has no DHS or DOS record, and no Virginia, District of Columbia (D.C.), or Maryland driver's license. The SSN listed on the ORTIZ DE CORPENO's U.S. Plastics job application was found in a database check; however the person to whom the SSN belonged was listed as deceased, indicating that ORTIZ DE CORPENO is likely using another individual's SSN. ORTIZ DE CORPENO received at least one check marked "PR." ORTIZ DE CORPENO was seen at WTC2 and US Plastic's office during the execution of the search warrant on September 3, 2015. The investigation has revealed that she was hired in approximately November 2014, at which time she was not asked about her employment authorization. ORTIZ DE CORPENO'smanager, JARQUIN, knew that ORTIZ DE CORPENO was not authorized to work. ORTIZ DE CORPENO was paid in cash and personal check from an account in JARQUIN'S name.

37.    Martha Juliana LOPEZ MONTERROSO has no DHS or DOS record, and no Virginia, D.C., or Maryland driver's license. The SSN listed on LOPEZ MONTERROSO'S U.S. Plastics job application was not found in database checks, indicating it is likely fraudulent. She received at least one check marked "PR." LOPEZ MONTERROSO was seen at WTC2 and US

13

Plastic's office during the execution of the search warrant on September 3, 2015. The investigation has revealed that LOPEZ MONTERROSO was hired in approximately October 2014, at which time JARQUIN was told that LOPEZ MONTERROSO was not authorized to work in the United States. LOPEZ MONTERROSO was paid by personal check's from an account in JARQUIN'S name.

38.     Maria Cristina HERNANDEZ has no DHS or DOS record.  The SSN on her U.S. Plastics' job application was not found in database checks, indicating it is likely fraudulent; similarly, no Virginia, D.C., or Maryland driver's license was found for HERNANDEZ. HERNANDEZ was seen at WTC2 and US Plastic's office during the execution of the search warrant on September 3, 2015. The investigation has revealed that she has been employed by U.S. Plastics for approximately one year and that at the time of her hiring, JARQUIN was told that HERNANDEZ was not authorized to work in the United States.  HERNANDEZ was paid in cash each week by AKRAM.

39.     Salvador Lucio RIVAS MEJIA was shown in DOS records to have been issued a B1/B2 /Visa in San Salvador on October 28, 1999.  His last period of authorized entry in the U.S. under that visa classification was from December 14, 2005 to June 13, 2006.  No departure or adjustment of status documents were found in DHS records, however, RIVAS MEJIA was observed at WTC2 during periodic surveillance. RIVAS MEJIA was seen at WTC2 and US Plastic's office during the execution of the search warrant on September 3, 2015. The investigation has revealed that he was hired by AKRAM in May 2008 to work at WTC2, at which time the only personal information that he was asked to provide was his name. RIVAS MEJIA has been paid in cash by AKRAM.

40.     Khaled GARADAH (KHALED) is the nephew of ALAA. He is an Egyptian national who is currently present in the United States in F-1 nonimmigrant student status.  DHS records reflect that KHALED is attending a school in Falls Church, Virginia and is not authorized to work in the United States.  During periodic surveillance conducted between June and August 2015, KHALED and/or the vehicle he used were observed by agents at WTC2 on several occasions.  Since the beginning of 2014, KHALED has received at least 40 checks from WTC2 or ALAA, all of which were signed by ALAA and some of which contained the handwritten notation "PR."  KHALED was observed working and managing WTC2 and/or U.S. Plastics employees. KHALED was seen at WTC2 and US Plastic's office during the execution of the search warrant on September 3, 2015. KHALED initially denied working for WTC2, but later admitted that he works 4-6 days a week.  KHALED stated that he knew he was not authorized to work because he had an F-1 visa.

41.     Records for **BH Account x8214** show that approximately 18 individuals are listed as the payees on regularly-issued checks.

### PROCEEDS TRACEABLE TO UNAUTHORIZED ALIEN EMPLOYMENT

42.     Monies are collected by WTC2 from its customers via checks and wire transfers and are deposited into **BH Account x8214**.  The money earned by WTC2 is based in part on work performed by WTC2's unlawfully employed workers.

### TRANSACTIONS DESIGNED IN WHOLE/IN PART TO AVOID REPORTING REQUIREMENT (STRUCTURING)

43.     From approximately March 26, 2015, thru August 6, 2015, twenty-one cash withdrawals were made from **BH Account x8214**, for a total of $189,000 in withdrawals.  Each withdrawal was for $9,000.

44.     On approximately March 26, 2015, ALAA deposited thirteen money orders worth $11,500 into **BH Account x8214**. All of the money orders were purchased on the same day by two other individuals. Ten of the money orders were for exactly $1,000. ALAA stated that the money orders were for his nephew, KHALED. However, when ALAA filled out the money orders, he made them payable to WTC2. ALAA then made a $9,000 cash withdrawal, at which time he stated that the withdrawal was to pay his "unbanked employees."

45.     ALAA is familiar with CTR reporting requirement and has previously structured cash withdrawals to avoid those reporting requirements.

CONSPIRACY TO ENGAGE IN MONEY LAUNDERING

*Promotion and Concealment Money Laundering (18 U.S.C. § 1956(a)(1))*

46.     The proceeds traceable to the illegal scheme to employ aliens were held and transferred among several different bank accounts, including **BH Account x8214**. These funds were previously kept in WTC2's PNC account x3614. By, among other things, making structured cash withdrawals and using cash to pay unauthorized workers, ALAA and others conspired to engage in financial transactions involving the proceeds of a specified unlawful activity, i.e., a violation of 8 U.S.C. § 1324(a), knowing that each of the transactions was designed in whole or in part to promote the crime or to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, in violation of 18 U.S.C. § 1956(h).

47.     Because **BH Account x8214** was funded with proceeds derived from unlawful employment of aliens and such proceeds were used to promote the unlawful scheme, in violation of 18 U.S.C. § 1956(a)(1)(A), and because the funds in **BH Account x8214** were involved in financial transactions designed in whole or part to conceal or disguise the nature, location,

16

source, ownership or control of the unlawful proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B), **BH Account x8214** is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) as property involved in money laundering. It also constitutes property involved in a conspiracy to commit money laundering as several people conspired to commit the laundering, in violation of 18 U.S.C. § 1956 (h).

*Transactional Money Laundering (18 U.S.C.§1957)*

48.     On February 5, 2015, $40,000 was deposited from the PNC 4307 account into **BH Account x8214.**

49.     On March 20, 2015, $1,024,172.56 was deposited into **BH Account x8214** via a PNC cashier's check payable to WTC2 Inc.  These funds were from WTC2's former operating account, which was used in a similar fashion to pay aliens who were not authorized to work.

50.     Because proceeds of a violation of 8 U.S.C. 1324(a) in excess of $10,000 were involved in a monetary transaction involving **BH Account x8214**, in violation of 18 U.S.C. §1957, the account funds are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A).

### FIRST CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. §§ 981(a)(1)(C)

51.     The United States incorporates by reference paragraphs 1 through 42 above as if fully set forth herein.

52.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title) or a conspiracy to commit such an offense."

53.    Title 18, United States Code, Section 1956(c)(7)(D) provides that the term "specified unlawful activity" includes an offense under 8 U.S.C. § 1324(a), alien smuggling and harboring.

54.    As set forth above, the defendant property constitutes proceeds of a violation of 8 U.S.C. § 1324(a).

## SECOND CLAIM FOR RELIEF
### (Forfeiture under 18 U.S.C. § 981(a)(1)(A))

55.    The United States incorporates by reference paragraphs 1 through 50 above as if fully set forth herein.

56.    Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 [or] 1957 . . . of this title, or any property traceable to such property."

57.    Title 18, United States Code, Section 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

> (A)    (i) with the intent to promote the carrying on of specified unlawful activity; or

> ***

> (B)    knowing that the transaction is designed in whole or in part—

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

58. Title 18, United States Code, Section 1956(a)(2) further imposes a criminal penalty on any person who:

> transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> (A) with the intent to promote the carrying on of specified unlawful activity; or
>
> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

59. Title 18, United States Code, Section 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." A "monetary transaction" includes the "deposit, withdrawal, transfer or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1).

60. Title 18, United States Code, Section 1956(h) imposes a criminal penalty on any person who conspires to commit any offense defined in 18 U.S.C. §§ 1956 or 1957.

61. As noted above, "specified unlawful activity" includes an offense under 8 U.S.C. § 1324(a).

62.     As set forth above, the defendant property constitutes property involved in money laundering transactions in violation of 18 U.S.C. §§ 1956 and 1957, and are therefore subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

### THIRD CLAIM FOR RELIEF
### (Forfeiture under 31 U.S.C. § 5317)

63.     The United States incorporates by reference paragraphs 1 through 45 above as if fully set forth herein.

64.     Title 31, United States Code, Section 5317 subjects to forfeiture "[a]ny property involved in a violation of section . . . 5324 of this title, or any conspiracy to commit any such violation, and any property traceable to any such violation or conspiracy."

65.     Title 31, United States Code, Section 5324 imposes a criminal penalty on any person who structures or attempts to structure any transaction to evading a reporting requirement, such as a currency transaction report for transactions in excess of $10,000.

The defendant property constitutes property involved in a violation of 31 U.S.C. § 5324 and is therefore subject to forfeiture under 31 U.S.C. § 5317.

### APPLICATION OF 18 U.S.C. § 984

66. To the extent that the funds presently in the bank account to which the illegal proceeds were transferred are not directly traceable to the proceeds of the violation of 8 U.S.C. § 1324(a), they represent identical property found in the same place or account from which the property involved in the offense was removed, and are therefore subject to forfeiture pursuant to 18 U.S.C. § 984.

## PRAYER FOR RELIEF

67.    WHEREFORE, Plaintiff requests that judgment be entered in its favor against the

defendant property; that pursuant to law, notice be provided to all interested parties to appear and

show cause why the forfeiture should not be decreed; that the defendant property be forfeited to

the United States of America and delivered into its custody for disposition according to law; that

Plaintiff be awarded its costs and disbursements in this action; and for such and further relief as

this Court may deem just and proper.

Dated: December 18th, 2015

Respectfully submitted,

Dana J. Boente
United States Attorney

By:    Karen L. Taylor

Karen Ledbetter Taylor
Assistant United States Attorney
Attorney for the United States of America
United States Attorney's Building
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia  22314
Phone:  703-299-3700
Fax:  703-299-3982
Email Address: Karen.taylor2@usdoj.gov

## VERIFICATION

Before me, the undersigned authority, on this date personally appeared Special Agent

Matthew M. Grimm who after being duly sworn, states that he makes this verification for and on

behalf of the Plaintiff, United States of America, that he has read the foregoing complaint and

knows the contents thereof, that his information and knowledge about its contents was obtained

by him in the course of his investigation and that of other law enforcement officers and

government agents, and that the matter and things set forth in the complaint are true to the best of

his knowledge, information and belief.

Matthew M. Grimm, Special Agent
U.S. Department of Labor
Office of Inspector General

SUBSCRIBED and SWORN to before me

this _18th_ day of December 2015

Notary Public   Angelamarie Bishop

My commission expires: 10/31/2018

Alexandria, Virginia

22